IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | ) CRIMINAL NO.  19-166 |
| | ) |
| vs. | ) |
| | ) |
| **MARTINEL LEE HUMPHRIES,** | ) |
| Defendant. | ) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

I.    Introduction

Defendant Martinel Lee Humphries ("Humphries" or "defendant") filed a motion to suppress evidence (ECF No. 29). The government filed a response in opposition to the motion, with attached exhibits (ECF Nos. 31, 32). On September 17, 2020, the court held an evidentiary hearing by videoconference, with the consent of all parties. The official transcript is filed at ECF No. 36.[1] The parties were permitted to file proposed findings of fact and conclusions of law. The parties filed those post-hearing submissions on November 3, 2020 (ECF Nos. 39, 40). The motion to suppress is ripe for disposition. There is no need for additional evidence or argument.

II.    Factual and Procedural Background

Humphries is charged in a three-count indictment at Criminal Number 19-166 with: (1) possession with intent to distribute a quantity of heroin and a quantity of fentanyl; (2) possession of a firearm in furtherance of a drug trafficking crime; and (3) possession of a firearm and ammunition by a convicted felon. These charges arise out of a traffic stop and subsequent search incident to arrest conducted on August 20, 2018.

---

[1] Citations to the transcript will be cited as "Tr. at __."

Humphries argues that : (1) the traffic stop was pretextual and without reasonable suspicion; (2) a K-9 sniff and search violated his Fourth Amendment rights; and (3) the search warrant was defective (ECF No. 39).  The government contends that the traffic stop, K-9 sniff and search warrant were lawful.

**Findings of Fact**

1. West Mifflin police officer Rick Marone ("Marone") and Ms. Taylor Parker ("Parker"), defendant's girlfriend at the time of the traffic stop, testified at the hearing. Both witnesses offered credible testimony.  Government exhibits 2, 3 and 5 and defense exhibit A, which included the search warrant, affidavit of probable cause, inventory receipt and hearing transcript filed at ECF Nos. 29-2, 29-3 and 31-1, were admitted into evidence.

   A.  The anonymous tips

2. In August 2018, Marone (and the entire police department) received two emails from the police department which described anonymous oral tips received about drugs and guns at the Mon View Heights housing complex in West Mifflin, Pennsylvania (Gov. Ex. 5).  Marone described that area as high drug and high crime.  Tr. at 13.

3. The first tip was from a female, who reported that a male nicknamed "bullet," who drove a silver Infiniti with the license plate KSY0864, was on probation and known to carry guns in his car.  The informant believed "bullet" was hooking up with a female that lived in the 20 row of the housing complex.  (Gov. Ex. 5).

4. In the email, it was reported that officers learned that license plate KSY0864 on a 2004 Infiniti (the "Infiniti") was registered to a Martinel Humphries.  (Gov. Ex. 5).

2

5. The second tip was also from a female, who reported that the driver of the Infiniti with license plate KSY0864 parked his car in the 20 row and went into the complex to visit a girl, although the apartment was unknown. The tipster reported that the driver's license was suspended, he keeps drugs and guns in the Infiniti, and he has hidden compartments in the vehicle. (Gov. Ex. 5).

6. Officers confirmed that Humphries' license was suspended. Officers drove past the housing complex and saw the Infiniti parked in the 20 row. In the email was an instruction that officers should "keep an eye out." (Gov. Ex. 5).

7. Marone testified that he intended to stop the Infiniti if he saw it operating on the road to determine whether the tips were accurate. Tr. at 25.

B. The traffic stop

8. At the time of the incident, Marone had been a police officer for over seven years and had performed hundreds of traffic stops for tinted windows. Tr. at 16.

9. On August 20, 2018, at approximately 4:30 p.m., Marone was in a marked police car parked in a lot at Bobick's garage, near the corner of Oak Street and Whittaker Street. Tr. at 23.

10. It was a bright, sunny day. Tr. at 15.

11. Marone spotted the Infiniti and observed that the windows were so heavily tinted that he could not see through them, even to catch a silhouette of the driver. Tr. at 15. Government exhibits 2 and 3 are photographs of the vehicle, which confirm that the windows are heavily tinted.

12. Marone conducted a traffic stop and approached the driver's side door.

13. The driver's side window was being lowered as Marone approached the Infiniti and he smelled an overwhelming odor of marijuana, both burnt and raw.  Tr. at 17.

14. Humphries was the only person in the vehicle.  The address on his driver's license reflected that he was living in the Mon View Heights housing complex.  Tr. at 21-22.

15. Humphries told Marone that he had smoked marijuana right before he left his house.  Tr. 18.

16. Marone detained Humphries for suspicion of driving under the influence ("DUI").

17. Marone did not see any drugs, paraphernalia or weapons in the vehicle.  Tr. at 26.

18. Humphries was removed, but the overwhelming raw marijuana smell continued to emanate from the vehicle.  Tr. at 34.

19. Officers Kintigh and Columbia arrived on the scene and searched the vehicle for marijuana and weapons.

20. Humphries' girlfriend, Ms. Parker, arrived on the scene.  Marone explained to her about the odor of marijuana and suspicion of DUI and gave her one of Humphries' cell phones.  Tr. at 34, 43.

21. Marone transported Humphries to the hospital for testing.  After they left the hospital, an EMS employee saw two marijuana joints (one smoked, one raw) fall, or be discarded, from Humphries' pants.  Tr. at 19, 32-33.

**The dog sniff**

22. Pursuant to standard procedures, officers performed an inventory search of Humphries' vehicle prior to having it towed.  Nothing was recovered during this inventory search.  Tr. at 19.

23. Officer Kintigh arranged for a K-9 from the Allegheny County Sheriff's Office to come to the scene. The dog handler was officer Brandon Tuzikow ("Tuzikow") and the dog's name was Fetyls.

24. Marone left the scene to transport Humphries to the hospital and neither of them have first-hand knowledge about the K-9 sniff. Tr. at 29. As the investigating officer, Marone received an oral report about the K-9 search from Officer Kintigh and included that information in preparing an affidavit for a search warrant. Tr. at 39.

25. Parker testified that the K-9 team arrived approximately twenty minutes after the Infiniti was stopped. The car doors were closed and the windows were up. K-9 Fetyls went around the exterior of the Infiniti. Tr. at 45.

26. Parker was asked: "And can you tell the Court, what did the dog do?" Parker answered: "He [K-9 Fetyls] went around the car once. And after he went around the car, he had stopped at the passenger door to be let in the passenger side front door." Tr. at 45.

27. The K-9 officer opened that door to let K-9 Fetyls in and closed the door for about thirty seconds before letting K-9 Fetyls back out. Tr. at 45-46.

28. The officers did not direct or place K-9 Fetyls inside the Infiniti. Instead, the officers opened the door after K-9 Fetyls alerted and waited to be let inside the vehicle.

29. Officer Kintigh advised Marone from the scene that the K-9 alerted on the passenger backseat area. Tr. at 39.

30. The vehicle was towed to the West Mifflin police department sally port, due to the odor of marijuana and concerns that other persons might try to get into the vehicle before a search warrant could be obtained. Tr. at 28-29,36.

**The search warrant**

31. The next morning, August 21, 2018, Marone applied for a search warrant to search the Infiniti.

32. In the affidavit of probable cause, Marone set forth his training and experience, including certification as a DANET agent with over fifty marijuana arrests. Marone stated his observation of the heavily tinted windows, Humphries' admission that he smoked marijuana shortly before driving as a basis for a DUI charge, the recovery of two marijuana joints from Humphries' pants, and the overwhelming odor of marijuana that persisted after Humphries was removed from the vehicle. The affidavit stated that a search of Humphries' criminal history disclosed prior arrests/convictions for drug and firearms violations. (ECF No. 29-2).

33. The affidavit stated that "Allegheny County Sheriff's Deputy Brandon Tuzikow and his partner Fetyls arrived on scene" and that Tuzikow informed officers at the scene that K-9 Fetyls alerted on the Infiniti's passenger back seat area. (ECF No. 29-2).

34. Two days after preparing the search warrant application, Marone received a four-page report about the K-9 sniff. Tr. at 31, 35. Marone did not have any information about the certifications, length of service or false positive alerts by K-9 Fetyls at the time he prepared the search warrant application. Tr. at 35.

35. The affidavit did not contain any information about the anonymous tips.

36. The search warrant was issued by a magisterial district judge at approximately 10:45 a.m. on August 21, 2018.

37. At approximately 11:30 a.m. that day, Marone and other officers executed the search warrant. In a zippered compartment in the back of the front passenger seat, officers recovered: (a) a Glock 42 .380 caliber firearm that had been reported stolen; (b) fifty-two

bundles of suspected heroin; (c) a baggie corner with suspected marijuana; and (d) a title showing Humphries' ownership of the vehicle.

38. The zippered compartment in the seat was not "hidden," in that it was visible to a person sitting in the back seat.  Tr. at 28.

**Conclusions of Law**

1. The Fourth Amendment protects the public from "unreasonable searches and seizures." U.S. Const. amend. IV.

2. The government must prove, by a preponderance of the evidence, that "each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *See United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005).  Evidence obtained from an investigatory stop made without reasonable suspicion may be suppressed as "fruit of the poisonous tree." *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (quoting *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963)).

3. A basic premise of the search and seizure doctrine is that searches undertaken without judicial oversight and a warrant issued upon probable cause are "per se unreasonable," subject only to a few specifically established exceptions.  *Katz v. United States*, 389 U.S. 347, 357 (1967).

    A.  The traffic stop

4. The Supreme Court established one such exception in *Terry v. Ohio*, 392 U.S. 1, 30 (1968), holding that a police officer may conduct a brief, investigatory stop when the officer, accounting for his professional experience, has a reasonable, articulable suspicion that criminal activity may be afoot.  The reasonable suspicion standard delineated in *Terry* applies

equally to routine traffic stops. *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006).

5. The government has the initial burden to prove that a *Terry* stop is based on reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Reasonable suspicion is an "elusive concept," but it unequivocally demands that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). Courts "afford significant deference to a law enforcement officer's determination of reasonable suspicion." *United States v. Foster*, 891 F.3d 93, 104 (3d Cir. 2018).

6. Although the Supreme Court has not specifically defined the phrase "reasonable suspicion," the "essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account." *Cortez*, 449 U.S. at 418. Seemingly innocent factors that may elude an untrained person can support reasonable suspicion based on an officer's training and experience. *Foster*, 891 F.3d at 104.

7. Stopping an automobile based upon at least articulable and reasonable suspicion that either a vehicle or an occupant is in violation of the law is not unreasonable under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). In fact, the foremost method for police officers to enforce traffic and vehicle safety regulations is by acting upon those observed violations. *Id.* at 659.

8. A police officer who observes a violation of state traffic laws may lawfully stop the car committing the violation. *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004).

9. Reasonable suspicion can be based even upon an officer's mistaken understanding or knowledge of the state's applicable traffic laws. *Heien v. North Carolina*, 574 U.S. 54, 60-

61 (2014).

10. In this case, Marone had the requisite reasonable suspicion to initiate a traffic stop on the vehicle on August 20, 2018.  Marone reasonably observed that the vehicle had improper tinted windows, in violation of 75 Pa. Cons. Stat. § 4524(e)(1) ("No person shall drive any motor vehicle with any sun screening device or other material which does not permit a person to see or view the inside of the vehicle through the windshield, side wing or side window of the vehicle.").

11. Marone need not have conducted an instrumental window tint measurement prior to initiating the traffic stop.  Such a precondition would be nonsensical because a window tint measurement could not be performed on a moving vehicle.

12. Humphries argues that the traffic stop was illegal because it was simply a pretext to investigate the information contained in the anonymous tips.  Marone's subjective motivation for making the traffic stop is irrelevant. There is "a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." *United States v. Wilson*, 960 F.3d 136, 145 (3d Cir. 2020) (citing *Whren v. United States*, 517 U.S. 806 (1996)).

13. The court, therefore, need not consider whether the anonymous tips had been sufficiently corroborated to independently provide reasonable suspicion for Marone to stop the vehicle.

14. The initial traffic stop on August 20, 2018, was lawful based on Marone's observation of heavily tinted windows in violation of 75 Pa. Cons. Stat. § 4524(e)(1).  *United States v. Hall*, 270 F. App'x 123 (3d Cir. 2008).

15. Humphries does not challenge Marone's further investigation, based on the odor of marijuana and Humphries' admission that he smoked marijuana before entering the vehicle,

or Marone's decision to take Humphies into custody for suspected DUI.

    B. <u>The K-9 sniff</u>

16. Defendant recognizes that a K-9 sniff of the exterior of a vehicle does not constitute a search and requires no further justification if it occurs during a lawful traffic stop. (ECF No. 39 at 9-10). Defendant argues, however, that when K-9 Fetyls entered the vehicle, the sniff turned into an unconstitutional search. The government did not respond to this argument.

17. In *United States v. Pierce*, 622 F.3d 209 (3d Cir. 2010), the Third Circuit Court of Appeals outlined the contours of Fourth Amendment principles related to K-9 sniffs.

18. In *Pierce*, the court explained it is well-established that a dog's positive alert while sniffing the exterior of the car provides an officer with the probable cause necessary to search the car without a warrant. *Id.* at 213 (citing *Karnes v. Skrutski*, 62 F.3d 485, 498 (3d Cir. 1995); *United States v. Massac*, 867 F.2d 174, 176 (3d Cir. 1989); *United States v. Williams*, 2006 WL 3052313, at *8, 2006 U.S. Dist. LEXIS 81010, at *25 (W.D. Pa. 2006) ("Once the 'hit' occurred, the officers had probable cause....")).

19. A trained narcotic dog's instinctive action of jumping into the car does not violate the Fourth Amendment. *Id.* at 213-14 (citing *United States v. Stone*, 866 F.2d 359, 364 (10th Cir. 1989)). The court explained in *Pierce* that the term "instinctive" implies that the dog "enters the car without assistance, facilitation, or other intentional action by its handler." *Id.*

20. A dog sniff becomes unconstitutional where the officer "facilitated or encouraged" the dog's entry into the car. *Id.* at 214. For example, in *United States v. Winningham*, 140 F.3d 1328, 1331 (10th Cir. 1998), the officers lacked any reasonable suspicion that the van contained drugs and opened the door while waiting for the drug dog to arrive. Similarly, in *State v.*

*Freel*, 29 Kan.App.2d 852, 32 P.3d 1219, 1225 (2001), the officer encouraged the dog to enter the car even though it had not alerted on the exterior. *See generally, Pierce*, 622 F.3d at 214 (discussing decisions).

21. In *Pierce*, the court concluded that the K-9's interior sniffs, as a natural migration from his initial exterior sniffs, did not constitute a search requiring a warrant or probable cause. *Id.* at 214-15.

22. The facts of this case, like in *Pierce*, are distinguishable from the cases finding constitutional violations.  The officers in this case had a reasonable suspicion that there were drugs in the vehicle based upon the overwhelming odor of raw marijuana smelled by Marone.  They kept the doors closed and the windows up while waiting for the K-9 unit to arrive.  K-9 Fetyls alerted on the exterior.  The only evidence on this point came from Taylor's testimony:

 "Q. And can you tell the Court, what did the dog do?

 A. He [K-9 Fetyls] went around the car once.  And after he went around the car, he had stopped at the passenger door to be let in the passenger side front door." Tr. at 45.

23. There is no evidence that any of the officers encouraged K-9 Fetyls to enter the interior until after it alerted at the passenger door.  Although the officers aided K-9 Fetyls' entry into the interior by opening the door, there is no evidence that the officers provoked, encouraged or directed the K-9 to enter the vehicle.

23. As in *Pierce*, K-9 Fetyls' interior sniffs in this case were a natural migration from its initial exterior sniffs and therefore did not constitute a search requiring a warrant or probable cause. *Id.* at 214-15.

24. In *Pierce*, the court held, in the alternative, that because the K-9 initially alerted to the outside of the car in the area of the front passenger seat, there was probable cause for a police

11

officer to search the interior of the car. *Id.* at 215 (citing *Massac*, 867 F.2d at 176). The court refused to remand the case, deeming it to be a pro forma exercise. *Id.*

25. This alternative rationale also applies in this case. First, the officers had probable cause to believe that drugs were in the Infiniti based upon Marone's smelling the overwhelming odor of burnt and raw marijuana, which persisted after Humphries was removed from the vehicle. Tr. at 17, 34; *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006). Second, because K-9 Fetyls alerted to the passenger side door to be let in, the officers had probable cause to search the interior of Humphries' vehicle.

26. As the court explained in *Pierce*, whether the K-9's entry into the car and interior sniffs did not amount to a search, or whether the K-9's alert when he was outside the vehicle gave the officers probable cause to search the car, is irrelevant. *Id.* Under either rationale, the officers conducted a constitutional search that yielded the drugs and firearm.

27. In summary, the K-9 sniff in this case did not violate Humphries' constitutional rights.

28. The court notes that the drugs and firearm were not found until after a search warrant was issued.

C. The search warrant

29. Humphries' challenge to the search warrant is very narrow. He contends the affidavit did not establish probable cause because it did not contain any information about K-9 Fetyls' qualifications.

30. As noted above, the basic premise of Fourth Amendment doctrine is that searches should be undertaken with judicial oversight. *Katz*, 389 U.S. at 357. Here, a search warrant was issued by a magistrate on August 21, 2018.

31. The court pays "great deference" to the magistrate's initial determination of probable cause. *Illinois v. Gates*, 462 U.S. 213, 236 (1983).  The court's role is limited to ensuring that a magistrate had a "substantial basis" for concluding that the affidavit supporting the warrant established probable cause. *Id.* at 236.

32. In *United States v. Rivera*, 347 F. App'x 833, 837 (3d Cir. 2009), the court rejected the argument that, absent specific facts in the warrant establishing a dog's reliability, a positive dog sniff cannot be considered as part of the "substantial basis" for probable cause.  The court stated:  "We have never created such a rule, and decline to adopt one at this time."  *Id.*

33. The facts in *Rivera* were similar to those in this case.  In *Rivera*, the affidavit in support of the search warrant stated that an officer brought a member of the police's K-9 unit to the scene, and that the K-9 indicated positive, which corroborated an initial tip.  The dog sniff was not the only element of probable cause.

34. The court held that under those circumstances, it was reasonable for a neutral and detached magistrate to infer that an identified member of the K-9 unit had the training and reliability required to detect narcotics and could consider that information in determining whether probable cause existed.   *Id.* at 838.

35. In this case, the affidavit identified that "Allegheny County Sheriff's Deputy Brandon Tuzikow and his partner Fetyls arrived on scene." (Def. Ex. A).   It was reasonable for the magistrate to infer that this identified law-enforcement K-9 team had the training and reliability required to support probable cause that drugs would be detected in the vehicle.

36. K-9 Fetyls' alert was not the only basis for probable cause to search the vehicle.  The affidavit also recounted, among other things, Marone's training and experience; the overwhelming odor of marijuana coming from the vehicle, which persisted after Humphries

was removed; Humphries' admission of recent drug use; the recovery of two marijuana joints from Humphries' pants; and Humphries' criminal history of drug arrests/convictions.

37. "It is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause." *Ramos*, 443 F.3d at 308.

38. Humphries' reliance on decisions from other circuits is not persuasive. In *Rivera*, the Third Circuit Court of Appeals recognized that other circuits have required more information about a K-9's reliability, but stated: "At this time we do not see a need to adopt such a rule." *Id.* at 839. The court stated: "While requiring a more detailed statement of training and reliability in the affidavit would facilitate the drawing of inferences by a neutral magistrate, the absence of such a statement does not preclude it." *Id.*

39. In *Rivera*, the court explained that if there were concerns about the K-9's unreliability, the affiant would be required by *Franks v. Delaware*, 438 U.S. 154 (1978), to disclose them. *Rivera*, 347 F. App'x at 839. Humphries did not raise a *Franks* challenge or challenge K-9 Fetyls' reliability in this case.

40. In sum, the court concludes that the magistrate had a substantial basis to conclude that the affidavit established probable cause to search the vehicle.

41. Even if the warrant would be deemed not valid because it failed to include the K-9's qualifications, the evidence would not be suppressed in this case because Marone was entitled to rely in good faith on the duly issued search warrant. As discussed above, the applicable guidance in the Third Circuit was that such a statement of K-9 qualifications was not required.

42. The Supreme Court noted in *United States v. Leon* that a situation in which an officer relies on a duly authorized warrant is a "particularly compelling example of good faith." 468 U.S.

897, 920 n.21 (1984).  The Supreme Court explained it is the magistrate's responsibility, not the police officer's, to determine whether the allegations establish probable cause and, if so, to issue a warrant.  *Id.* at 921.  Ordinarily, an officer cannot be expected to question the magistrate's probable cause determination.  *Id.*  A warrant is a judicial mandate and the officer has a sworn duty to carry out its provisions.  *Id.*

**<u>Conclusion</u>**

For the reasons set forth above, none of Humphries' arguments for suppression are meritorious.  Marone had reasonable suspicion to conduct the initial traffic stop based upon his observation of the heavily tinted windows on Humphries' Infiniti vehicle; the subsequent K-9 sniff, which moved to the interior of the vehicle only after K-9 Fetyls alerted on the exterior, was lawful; and the search warrant affidavit provided a substantial basis for the magistrate to conclude there was probable cause, even though it did not contain information about the K-9 team's reliability.  In accordance with the foregoing, the motion to suppress evidence (ECF No. 29) will be DENIED.

An appropriate order will be entered.

December 2, 2020

BY THE COURT:

/s/ *Joy Flowers Conti*
Joy Flowers Conti
Senior United States District Judge